IN THE UNITED STATES DISTRICT COURT

FOR THE DISTRICT OF IDAHO

| | | |
|---|---|---|
| KENNETH D. ARRASMITH, | ) | |
| | ) | |
| Petitioner, | ) | Case No. CV 04-420-S-EJL |
| | ) | |
| v. | ) | **MEMORANDUM ORDER** |
| | ) | |
| JEFF CONWAY, Warden, | ) | |
| | ) | |
| Respondent. | ) | |
| _____ | ) | |

Pending before the Court in this habeas corpus case are Respondent's Motion for

Summary Judgment (Docket No. 28), Respondent's Motion to Strike (Docket No. 38),

Petitioner's Motion for Extension of Time to File Response (Docket No. 39), and

Petitioner's Motion for a More Definite Statement (Docket No. 42).  Having reviewed the

motions, responses, and replies, if any, the Court finds that oral argument is unnecessary.

Accordingly, the Court enters the following Order.

## I.

## BACKGROUND

In 1995, Petitioner was convicted in state district court of one count of first degree

murder for killing Luella Bingham, and one count of second degree murder for killing her

**MEMORANDUM ORDER - 1**

husband, Ronald Bingham.  On November 22, 1995, Petitioner was sentenced to a fixed

life term for the first degree murder conviction and a 25-year to life term for the second

degree murder conviction.  Petitioner's direct appeal and post-conviction relief actions

were unsuccessful.

The facts of the case, as found by the Idaho Court of Appeals, are as follows:

On the afternoon of May 15, 1995, Arrasmith turned himself in to
the Asotin County Sheriff's Office, in the state of Washington, after
shooting Ronald and Luella Bingham at their automotive repair shop
located on Shelter Road in Lewiston, Idaho. Law enforcement personnel
were dispatched to the scene of the shooting, where the Binghams were
found dead. Within days, Arrasmith was charged with two counts of first
degree murder in the Nez Perce County district court in Idaho.

The events leading up to the fateful meeting between Arrasmith and
the Binghams are as follows. In the spring of 1995, Cynthia Arrasmith, the
fifteen-year-old daughter of Kenneth Arrasmith, and her boyfriend moved
into the home of Ronald and Luella Bingham in Clarkston, Washington. In
exchange for a place to live, Cynthia helped Luella with household chores
and her boyfriend was to work on cars with Ronald at the Binghams' repair
shop which was located in Lewiston, Idaho, across the Snake River from
Clarkston, Washington. This arrangement was short-lived however, and the
boyfriend was kicked out. Cynthia stayed on at the Binghams', spent much
of her time in Luella's company, and rarely left the home except with
Luella. Cynthia's mother, Linda Bartlett, knew where her daughter was
living and believed that she was being cared for by the Binghams. Bartlett
had gone to the Binghams' home to visit with her daughter and Luella on at
least one occasion. Arrasmith learned of his daughter's living arrangements
through telephone calls with Cynthia and her mother.

All of the individuals living at the Binghams' home during the time
Cynthia resided there were using drugs on a daily basis. Cynthia regularly
participated with Ronald and Luella in using methamphetamine and
marijuana. This fact was not known to Cynthia's parents, nor were the
sexual molestation and rapes perpetrated on Cynthia by the Binghams that
Cynthia eventually revealed to her parents. Cynthia claimed that she did not

**MEMORANDUM ORDER - 2**

try to extricate herself from the situation because she feared what Ronald Bingham might do.

When the lurid details of Cynthia's life with the Binghams came to light, her parents sought the assistance of the police in removing Cynthia from the Binghams' home. Based on the reported drug activity at the home, the police searched the house on April 17, 1995. The police found no drugs and determined that they had no basis to remove Cynthia from the home. Sometime later, Cynthia escaped and sought to get away from the Binghams by going to California. She was promptly picked up on a run-away report signed by Cynthia's mother and was detained in a juvenile detention facility for her safety.

Arrasmith took steps to aid the police in their investigation but became frustrated that the police had not arrested the Binghams and charged them with the sexual abuse and rape of his daughter. On May 17, 1995, wearing a gun in a shoulder holster and carrying another gun which he had partially concealed in a box, Arrasmith went to the Binghams' repair shop where he shot Ronald twenty-three times and Luella seven times. Luella had been shot six times in the back and Ronald's body was found under a vehicle he had been working on.

*State's Exhibit B-4*, *State v. Arrasmith*, 966 P.2d 33, 38 (Idaho Ct. App. 1998).

Earlier in this habeas corpus case, the Court summarily dismissed the following claims: II(a), II(c), II(d), and III. *See Order filed July 7, 2005* (Docket No. 18).

Respondent's pending Motion for Summary Judgment addresses all remaining claims.

## II.

## PRELIMINARY MOTIONS

### A.    Respondent's Motion to Strike

Respondent has filed a Motion to Strike (Docket No. 38), asserting that

Petitioner's submission of an after-trial juror statement is inadmissible.  Petitioner has

**MEMORANDUM ORDER - 3**

submitted the statement of Sandra Swope, a juror from Petitioner's criminal trial, who

opines:

> If the police had reported their discovery of handguns belonging to, or being used by, Mr. or Mrs. Bingham at the crime scene, Mr. Arrasmith's testimony of acting in self defense would have had much more credibility. This would have had a huge effect on the jury deliberations and my verdict.

*Petitioner's Memorandum in Opposition to Motion for Summary Judgment*, at pp. 20-21

(Docket No. 35).

The Court agrees that the evidence Petitioner seeks to submit is inadmissible.

Federal Rule of Evidence 606(b) prohibits post-verdict inquiry into jury deliberations.

*See U.S. v. Bussell*, 414 F.3d 1048, 1059 (9th Cir. 2005) (evidence that jurors stated that

they "wished [they] had heard testimony . . . from prior clients" was inadmissible under

Rule 606(b) as testimony regarding "statement[s] occurring during the course of the jury's

deliberations"); *Williams v. Collins*, 16 F.3d 626, 636 (5th Cir. 1994) (district court

properly denied evidentiary hearing where habeas petitioner wished to have state jurors

testify as to whether their deliberations would have been different if they had been

presented with the mitigating evidence that was allegedly available but not presented at

trial).

The Court also notes that there is no evidence in the record supporting Ms.

Swope's assumption that the handguns either *belonged to* or *were being used by* the

Binghams.  As a result of the foregoing, Petitioner's Motion shall be denied.

**MEMORANDUM ORDER - 4**

**B.     Petitioner's Rule 12(e) Motion**

Petitioner has also filed a "Rule 12(e) Motion for a More Definite Statement,"
arguing that Respondent's Motion to Strike is so vague that he cannot form a response to
it.  Respondent is correct in arguing that Rule 12(e) does not apply because Respondent's
Motion is not a "pleading" under Rule 7(a).  In addition, a response from Petitioner to the
Motion to Strike would not aid the Court in resolving the Motion because it addresses a
well-settled issue of law.  Therefore, the Motion for a More Definite Statement is subject
to denial.

## III.

## RESPONDENT'S MOTION FOR SUMMARY JUDGMENT

**A.     Standard of Law**

Summary judgment is appropriate when "the pleadings, depositions, answers to
interrogatories, and admissions on file, together with the affidavits, if any, show that there
is no genuine issue as to any material fact and that the moving party is entitled to a
judgment as a matter of law."  Fed. R. Civ. P. 56(c).  The Federal Rules of Civil
Procedure apply to habeas corpus actions except where application of the rules would be
inconsistent with established habeas practice and procedure.  Rule 11, Rules Governing
Section 2254 Cases.  Accordingly, summary judgment motions are appropriate in habeas
corpus proceedings when there are no genuine issues of material fact and the moving

**MEMORANDUM ORDER - 5**

party is entitled to judgment as a matter of law. *Blackledge v. Allison*, 431 U.S. 63, 80-81 (1977).

Petitioner's case was filed after April 24, 1996, making it subject to the Antiterrorism and Effective Death Penalty Act of 1996 (AEDPA). In order to obtain federal habeas corpus relief from a state court judgment under AEDPA, the petitioner must show that the state court's adjudication of the merits of his federal claim either:

> 1. resulted in a decision that was contrary to, or involved an unreasonable application of, clearly established Federal law, as determined by the Supreme Court of the United States; or
>
> 2. resulted in a decision that was based on an unreasonable determination of the facts in light of the evidence presented in the State court proceeding.

28 U.S.C. § 2254(d).

In *Williams v. Taylor*, 529 U.S. 362, 385 (2000), the United States Supreme Court explained that, to prevail under § 2254(d)(1), a petitioner must show that the state court was "wrong as a matter of law," in that it "applie[d] a legal rule that contradicts our prior holdings" or that it "reache[d] a different result from one of our cases despite confronting indistinguishable facts." *Ramdass v. Angelone*, 530 U.S. 156, 165-66 (2000) (citing *Williams v. Taylor*). Or, a petitioner can prevail by showing that the state court was "[objectively] unreasonable in applying the governing legal principle to the facts of the case," or "was unreasonable in refusing to extend the governing legal principle to a context in which the principle should have controlled." *Ramdass v. Angelone*, 530 U.S. at

**MEMORANDUM ORDER - 6**

166 (citing *Williams v. Taylor*).  However, a petitioner cannot prevail under the unreasonable application clause "simply because that court concludes in its independent judgment that the relevant state-court decision applied clearly established federal law erroneously or incorrectly."  *Williams*, 529 U.S. at 411.

Under AEDPA, "[f]actual determinations by state courts are presumed correct absent clear and convincing evidence to the contrary." *Miller-El v. Cockrell*, 537 U.S. 322, 340 (2003); 28 U.S.C. § 2254(e)(1).  A state court decision "based on a factual determination will not be overturned on factual grounds unless objectively unreasonable in light of the evidence presented in the state-court proceeding." *Miller-El*, 537 U.S. at 340; 28 U.S.C. § 2254(d)(2).

**B.      Petitioner's Statement of Facts**

The Court found several discrepancies between Petitioner's Statement of Facts submitted in opposition to summary judgment and Petitioner's trial testimony.  For example, in Petitioner's Statement of Facts, he writes:

> As I reached the southwest corner of the building I came upon three vehicles parked on the west side of the shop.  Ron Bingham *was standing directly behind the third vehicle*.  As I advanced towards Ron Bingham, I stated to him "I want to talk with you about my daughter."  He replied "fuck you" and "fuck your daughter" while at the same time he uttered a statement about a gun[:]  "Get gun[,]" or "get my gun."  In either event, he bent down and reached for a shiny object from beneath the vehicle he was working on.  It was at that time I fired my weapon and he was shot dead.

*Petitioner's Statement of Facts*, at p. 3 (Docket No. 36) (emphasis added).  To the contrary, at trial, he testified:

**MEMORANDUM ORDER - 7**

> Q. When you got there, what was he doing?
>
> A. He *was just then getting down on to his hands and knees* or something to work on the – the bumper on the back of a pickup.

*State's Exhibit A-6,* at p. 1868 (emphasis added).

Further, in Petitioner's Statement of Facts, he said that Luella Bingham "raised and extended her arm *pointing* a 'small *black* automatic handgun at me.'" *Statement of Facts*, at p. 4 (emphasis added).  At trial, he testified differently in response to the following questions:

> Q. So, if I understood your testimony right, then she didn't point this weapon at you?
>
> A. She was turning towards me, and, no, it wouldn't have been pointed right directly at me, no.
>
> Q. In fact, it wouldn't have been pointed at you at all?
>
> A. No.

*State's Exhibit A-6*, at pp. 1888-89.  Petitioner also testified at trial that "I can't tell you if it [the gun] was silver or if it was black because I don't remember." *State's Exhibit A-6*, at p. 1887-88.

Petitioner cannot create an issue of fact by using his Statement of Facts to contradict his own testimony at trial.  *Kennedy v. Allied Ins. Co.*, 952 F.2d 262, 266 (9th Cir. 1991).  Accordingly, any facts in Petitioner's Statement of Facts that contradict his trial testimony shall be disregarded.

**MEMORANDUM ORDER - 8**

C.      **Discussion of Claims I, I(a), (b), (d) & (e) (*Brady v. Maryland*)**

    1.      Petitioner's *Brady* Claims

Claim I and Claims I(a),(b), (d), and (e) are all related to Petitioner's argument that the prosecution violated *Brady v. Maryland*, 373 U.S. 83 (1963).   Specifically, after trial Petitioner learned that officers failed to disclose that they had found and removed two guns from the grounds of the automotive business where Luella and Ronald Bingham were shot to death.  Petitioner asserts that the officers gave false testimony at the trial by stating that no weapons had been found at the murder scene.

The particular claims are as follows:

Claim I          The prosecution had evidence favorable to the defense in its possession but failed to disclose it to Petitioner, a violation of *Brady v. Maryland*, 373 U.S. 83 (1963).

Claim I(a)       The State deliberately presented false evidence, specifically, false testimony of the sheriff's deputies and investigators regarding whether weapons were found at the scene.

Claim I(b)       The State failed to correct the deliberate presentation of false testimony mentioned in Claim I(a).

Claim I(d)       Petitioner was denied a new trial when the net effect of the evidence that was withheld by the State raised a reasonable probability that its disclosure may have produced a different result.

Claim I(e)       The state courts applied an incorrect standard of materiality in analyzing the significance of the evidence of the two weapons found at the crime scene and not disclosed to him.

**MEMORANDUM ORDER - 9**

2.    Standard of Law

In *Brady v. Maryland*, 373 U.S. 83, 87 (1963), the United States Supreme Court held that in order for a constitutional suppression violation to occur, the evidence must have been (1) suppressed; (2) favorable to the defendant; and (3) material either to guilt or to punishment.  In *United States v. Bagley*, 473 U.S. 667, 676 (1985), the United States Supreme Court clarified that "impeachment evidence . . . as well as exculpatory evidence, falls within the *Brady* rule."   In *Bagley*, the Supreme Court also abandoned the practice that a different standard of law should be applied depending upon whether the defense had requested the information.  *Id*. at 683 (disavowing distinctions stated in *United States v. Agurs*, 427 U.S. 97 (1976)).

The *Bagley* decision also clarified that "evidence is material only if there is a reasonable probability that, had the evidence been disclosed to the defense, the result of the proceeding would have been different."  *Id*. at 682.  In other words, a "'reasonable probability' is a probability sufficient to undermine confidence in the outcome."  *Id*.

The United States Supreme Court has made it clear that exculpatory evidence need not be evidence that would have produced an acquittal.  *Kyles v. Whitley*, 514 U.S. 419, 434 (1995).  It need only be evidence "favorable to the accused,"  *Brady*, 373 U.S. at 87, and of the nature that it creates a "reasonable probability" that had the evidence been disclosed to the defense, the result of the proceeding would have been different." *Bagley*, 473 U.S. at 681.  "[A] showing of materiality does not require demonstration by a

**MEMORANDUM ORDER - 10**

preponderance that disclosure of the suppressed evidence would have resulted ultimately in the defendant's acquittal. . . ." *Kyles*, 514 U.S. at 434 (citing *Bagley*, 473 U.S. at 682). Stated simply, "[s]uch evidence is favorable to an accused . . . so that, if disclosed and used effectively, it may make the difference between conviction and acquittal." *Bagley*, 473 U.S. at 676.

      3.        Section 2254(d)(2) - State Court's Determination of Facts

Respondent first argues that Petitioner is not entitled to federal habeas corpus relief because he has not shown that the state court's determination of the facts relevant to his *Brady* claim was unreasonable under 28 U.S.C. § 2254(d)(2).  Petitioner was afforded an evidentiary hearing in state court on his *Brady* claim.  Under these circumstances, the Court presumes that the factual determinations made by the state court are correct unless Petitioner presents clear and convincing evidence to the contrary.  *See* 28 U.S.C. § 2254(e)(1).

The evidence presented at the state court evidentiary hearing showed that sheriff's officers found two guns on the premises of the automotive repair shop where Petitioner killed the Binghams.  One was a .357 magnum that an employee, Clifford Whitcomb – who happened to be the son of Captain Scott Whitcomb, the second-in-command at the sheriff's office –  had placed under the front passenger seat of a Colt Vista parked inside the garage.  Clifford Whitcomb testified that he had placed it there about two days before

**MEMORANDUM ORDER - 11**

the incident and that, after the incident, it was in the same condition as when he had left it there.  The .357 magnum actually belonged to Captain Whitcomb.

The other gun was Clifford's own Beretta nine millimeter pistol that was found in a bench drawer in the back of the shop building where the Binghams were shot.  Clifford testified that the gun was in the same condition as when it had been left in the shop, and that there was dust on the trigger and trigger guard of the gun.  Clifford also stated that he had not spoken to the Binghams about the presence of the guns at the shop and did not believe that either victim knew about the guns.  There was no evidence that either gun had been fired recently.  *See State's Exhibit B-4*, at pp. 45-46.

The body of Mrs. Bingham was found at the opposite end of the shop from where the gun in the bench was found.  The body of Mr. Bingham was found outside the shop where he was shot to death underneath the truck he had been working on.  The officers testified that no weapons were found near either body.

The state district court found that, based on the foregoing evidence, the officers had not testified falsely about the lack of guns at the crime scene, because the evidence showed that the Binghams had no access to the guns near the time they were shot.

Petitioner brings forward no clear and convincing evidence to rebut the presumption of correctness of these findings.  Petitioner has not shown that the officers were lying about where they found the guns, nor has he shown that the guns had been near or used by the victims during the shooting.  Petitioner has no witnesses or tangible

**MEMORANDUM ORDER - 12**

evidence supporting his position, but relies only on remote inferences.  The state trial

court addressed Petitioner's inferences as follows:

> The evidence is that the nine millimeter Barretta was owned by
> Clifford Whitcomb and that the .357 magnum was owned by Captain
> Whitcomb and had been removed from his home by Clifford.  Both guns
> were found at the crime scene.  Ronald Bingham was present at the scene as
> late as one o'clock a.m. on the night before the shootings.  Ronald Bingham
> spoke with Clifford and perhaps used drugs with him.  The evidence is that
> Bingham did not use the shop often and that he did not know of the
> presence of the guns.  But stretching a point, the Court infers that Bingham,
> like the neighbor, knew that Clifford kept guns on the premises and perhaps
> knew of the location of each gun.  Stretching even more, the Court could
> even infer that Bingham handled the weapons on that evening and that his
> finger prints could have been found on them.  The evidence is, however,
> that at the time of the shooting . . . Bingham was working under a truck
> outside the shop.  Medical evidence demonstrates that he was shot as he lay
> in a defensive posture.  The Court can not infer that the weapons were
> within his reach.  Such an inference is necessary to support Arrasmith's
> claim that he shot in self defense.
>
> Similarly, the evidence does not support any inference favorable to
> Arrasmith in the death of Luella.  At trial Paul Sharrai testified that when
> the shooting started he ran and was followed by Luella.  Even if the Court
> infers that she knew about the guns and their location, the medical evidence
> establishes that she was shot in the back six times, at least two times of
> which as she fell or lay on the ground.  The presence of the guns at the site
> and even evidence that the police removed the gun from the drawer is of no
> value in a defense of self defense or defense of others when a victim is shot
> in the back.  Even if the Court finds that all of the police evidence is not
> credible, which it does not, the medical evidence, the testimony of Kyle
> Richardson and Arrasmith's own testimony diminish[] a finding of legal
> justification for the killings.

*State's Exhibit A-3*, at pp. 450-51.

Upon these facts, the Idaho Court of Appeals affirmed the conviction and rejected

Petitioner's *Brady* claims.  Having reviewed the record, the Court concludes that

**MEMORANDUM ORDER - 13**

Petitioner has not shown that the state court findings of fact were incorrect by presenting

clear and convincing evidence to the contrary,  *see* § 2254(e)(1), nor has he shown that

the state courts made an unreasonable determination of the facts in light of the evidence

presented in the state court proceedings, *see* § 2254(d)(2).   A state court decision "based

on a factual determination [cannot] be overturned on factual grounds unless objectively

unreasonable in light of the evidence presented in the state-court proceeding." *Miller-El*,

537 U.S. at 340.  Based on the circumstances of this case, the state court findings of fact

relevant to the *Brady* claims are not objectively unreasonable.  There is no evidence in the

record supporting Petitioner's assertion that the Binghams handled or had access to the

guns in question at or near the time they were shot.  As a result, habeas corpus relief is

not warranted under § 2254(d)(2).


        3.        <u>Section 2254(d)(1) -  State Court's Application of Law to the Facts</u>

Respondent next argues that Petitioner has failed to show that the state court

decision "resulted in a decision that was contrary to, or involved an unreasonable

application of, clearly established Federal law, as determined by the Supreme Court of the

United States."  § 2254(d)(1).  As explained above, the facts this Court must use in its

analysis are those found by the state court after an evidentiary hearing on the issue.

In its opinion rejecting Petitioner's *Brady* claim, the Idaho Court of Appeals

described the relevant factual findings of the state trial court:


**MEMORANDUM ORDER - 14**

The district court found that the guns should have been disclosed pursuant to the defense's discovery request and that the state's conduct in withholding that evidence subjected the state to sanctions. Applying the standard set forth for dismissal under I.C.R. 48(a)(2), the district court made the following findings:

[T]he evidence established beyond a reasonable doubt that Luella was shot in the back as she ran away and fell to the ground. By his own admission Arrasmith, after shooting her husband twenty three times as he lay prone beneath a vehicle, searched the shop to find Luella before first shooting her from the side and then in her back.

*State v. Arrasmith*, 966 P.2d 33, 45-46 (Idaho Ct. App. 1998).

In analyzing the *Brady* claim within the context of a motion for a new trial, the

Idaho Court of Appeals identified the proper standard of law for the *Brady* claims at issue

here:

A defendant is entitled to a new trial when the net effect of the evidence withheld by the state raises a reasonable probability that its disclosure would have produced a different result. *Kyles v. Whitley*, 514 U.S. 419, 115 S.Ct. 1555, 131 L.Ed.2d 490 (1995). The standard for evaluating the value of the withheld evidence is derived from *United States v. Bagley, supra*, where the Court indicated: [T]he evidence is material if there is a reasonable probability that, had the evidence been disclosed to the defense, the result would have been different. A reasonable probability is a probability sufficient to undermine confidence in the outcome.

*Id*. at  46.

After reciting these standards, the Idaho Court of Appeals noted that the state

district court had determined that Petitioner's *Brady* claim did not entitle him to a new

trial because the evidence was "neither impeaching nor exculpatory."  *Id*. at 46.  The

Court of Appeals then concluded:

**MEMORANDUM ORDER - 15**

Considering the nondisclosed evidence in the context of the entire record, we conclude that the result would not have been different if this evidence had been timely disclosed. *See Bagley*, 473 U.S. at 678, 105 S.Ct. at 3381. We conclude that the prosecutor's nondisclosure of the gun evidence, in violation of *Brady*, was properly analyzed by the district court and did not, on due process grounds, demand a new trial. Therefore, we uphold the decision of the district court denying the new trial motion.

*Id.* at 46-47.

This Court finds that the Idaho Court of Appeals properly considered the suppressed evidence in light of all of the other evidence in the record, as *Kyles* requires. *See* 514 U.S. at 436.  However, it is unclear whether, the Idaho Court of Appeals, after reciting the correct standard of law and considering all of the evidence, actually *applied* a wrong standard when it stated, "we conclude that the result would not have been different if this evidence had been timely disclosed."  A proper statement of the test is whether there is a *reasonable probability* that the result would have been different.  *Bagley*, 773 U.S. at 682.[1]

Two approaches to the Idaho Court of Appeals' conclusion are possible; neither leads to federal habeas corpus relief.  First, because the Idaho Court of Appeals engaged in a lengthy recitation of the proper standard when it stated the applicable law in its opinion, one can infer that the court was simply using a shorthand reference in its

---

[1]  The Court notes that in Claim I(e), Petitioner particularly asserts that the state *trial* court used the wrong standard to assess the *Brady* claim.  However, habeas corpus review is concerned with the last reasoned state court decision on the *Brady* issue and the subject of materiality.  *See Ylst v. Nunnemaker*, 501 U.S. 797, 803-04 (1991). That decision is the opinion of the Idaho Court of Appeals, which the Court analyzes in the body of this Order, *infra*.  *See State's Exhibit B-4*.

**MEMORANDUM ORDER - 16**

conclusion when it left out the words, "reasonable probability."  If this is the case, then

the Idaho Court of Appeals applied the correct test and arrived at a conclusion that is not

contrary to, or an unreasonable application of, federal law.  However, this Court prefers

not to rely on an assumption.  Therefore, the Court proceeds to a de novo analysis of the

claim, as permitted by habeas corpus law under these circumstances.  *See Barker v.*

*Fleming*, 423 F.3d 1085, 1094 (9th Cir. 2005) (if the state court fails to conduct a proper

*Brady* analysis, AEDPA's restrictions do not apply, and the federal habeas court conducts

a de novo review of the petitioner's claim).

 Based upon its own review of the state court record in light of *Brady*, *Bagley*, and

*Kyles*., the Court concludes that *Brady* was not violated.  There is no doubt that the first

*Brady* factor – suppression – is met because the guns were not disclosed to the defense

prior to trial.  The second *Brady* factor is whether the evidence was favorable to

Petitioner, and the third factor is whether the evidence was material to guilt or

punishment.  In a broad sense, the evidence may seem favorable to Petitioner – guns

found at the crime scene where Petitioner was asserting that the male victim was reaching

for a gun and the female victim had a gun in her hand.  However, in light of the facts in

the state court record, the evidence was neither favorable nor material, as the state court

findings of fact recited above demonstrate.

 In addition to the facts set forth above, the Court finds that the following facts are

relevant to a showing that the Binghams had no guns and that the killings were not done

**MEMORANDUM ORDER - 17**

in self-defense, undermining Petitioner's assertion that the suppressed guns were

favorable and material evidence.  Kyle Richardson testified that Petitioner made many

advance preparations for the day he shot the Binghams, including inhaling

methamphetamine every day for ten days prior to the shootings and conducting

surveillance on their home.  *State's Exhibit A-5*, at pp. 1389-1393.  Kyle Richardson

testified that Petitioner stated prior to the shootings that "[h]e wanted to kill Ron, but –

and he – it would be nice to get Luella, too.  But he didn't want to do it at their house

because of the fact – inside their house because of the fact of Josh being there and also

Luella's mom.  So, he wanted to get Ron basically away from the house."  *Id.* at p. 1409.

This Court also agrees with the state trial court's assessment of Petitioner's

testimony at trial as "implausible."  *State's Exhibit A-3*, at p. 440.  Specifically, the trial

court noted:

> At one point [Arrasmith] testified that he did not remember shooting
> Ronald Bingham, only that he remembered hearing the shots and wondering
> why he wasn't hurt.  Later in his testimony he told the jury that he saw
> Ronald move and saw something silver.  At another point he said the
> shooting arose because he was trying to protect his daughter and at another
> point he said that he was trying to protect a fourteen year old girl who he
> knew the Binghams were grooming to molest.  He also intimated that he
> was protecting past victims and that although he went looking for Luella
> with two weapons in his hands he just wanted a statement.  He said he saw
> a gun in Luella's hand but again did not remember shooting her.
> Throughout his testimony and in closing argument he offered the
> justification contained in the question, "What would you do?"

*State's Exhibit A-3*, at p. 440.

**MEMORANDUM ORDER - 18**

Other evidence in the record undermines Petitioner's testimony that he did not know he shot the Binghams multiple times.  The record shows that Petitioner's semi-automatic weapon jammed after he had shot Ronald Bingham four times on the right side of the body and Ronald Bingham had lifted his arm up in a defensive position.  Petitioner then had the presence of mind to stop, fix the jam, *id*. at pp. 1513-14, move to Bingham's left side, and proceed to shoot him 19 more times.  Petitioner's gun required him to pull the trigger each time.  *Id*. at p. 1488.  Petitioner then took out his nine millimeter Ruger from its holster underneath his shirt and went to find Luella.

The record also contains many statements of Petitioner that show his actions were not in self-defense.  Petitioner stated on a radio talk show that "the Binghams picked the wrong person to violate, that cost them their end," and said on the 20/20 television show that "no one should be forced to take the law into their own hands."  *State's Exhibit A-6*, at pp. 1893-94 & 1930.  Robert Hough, Petitioner's brother-in-law, testified that Petitioner told him that "the Binghams were going to get taken care of one way or the other."  *Id*. at p. 1813.  An eyewitness at the auto shop testified that on the day of the shootings, as Petitioner approached Ron Bingham, Petitioner said to Bingham, "I got something for you. . . .  It's real special."  *Id*. at 980.

Upon all of these facts, applying the *Brady-Bagley-Kyles* standard of law de novo, the Court concludes that no *Brady* violation occurred.  There is simply no evidence in the

**MEMORANDUM ORDER - 19**

record that the Binghams had any access to the guns at the time of the shootings, and thus the suppressed evidence is neither favorable nor exculpatory in the context of this case.

Other courts' rulings on similar issues support such a decision. *Compare U.S. v. Woodlee*, 136 F.3d 1399, 1411 (10th Cir. 1998) (no *Brady* violation where police suppressed evidence that victim had a gun in his car, where the victim never removed the weapon from his car prior to being shot, never used the weapon, and the defendants did not know he had the weapon), *with Campbell v. Marshall*, 769 F.2d 314, 316-17 (6th Cir. 1985) (*Brady* violation occurred where Petitioner's defense in a shooting death was self-defense, Petitioner testified that he thought he saw the victim reach into his pocket, and after the shooting the police suppressed the fact that they had found a small pistol in the victim's pocket).

As a result of all of the foregoing, federal habeas corpus relief is not warranted. Claim I and Claims I(a), (b), (d) and (e) shall be dismissed with prejudice.

## C.    Discussion of Claim I(c)

Petitioner asserts that, alternatively, his *Brady* claim can be characterized as a due process claim under *California v. Trombetta*, 467 U.S. 479 (1984), and *Arizona v. Youngblood*, 488 U.S. 51 (1988).  In *Trombetta*, the Supreme Court held that destruction or loss of evidence violates the Constitution only when the evidence (1)  "possess[es] an exculpatory value that was apparent before the evidence was destroyed," and (2) is  "of such a nature that the defendant would be unable to obtain comparable evidence by other

**MEMORANDUM ORDER - 20**

reasonably available means." 467 U.S. at 489.  In *Youngblood*, the Supreme Court further held that where lost or destroyed evidence is deemed to be only potentially exculpatory, as opposed to apparently exculpatory, the defendant must show that the evidence was destroyed in bad faith.  488 U.S. at 58.

The Idaho Court of Appeals did not specifically address this alternative claim, although it implicitly rejected it in its *Brady* analysis.   The Ninth Circuit has instructed that, when there is no reasoned state court decision on a claim, the federal district court on habeas review is to perform an independent review of the state court record to ascertain whether the state court decision was objectively unreasonable, rather than a de novo review of the constitutional issue.  *Himes v. Thompson*, 336 F.3d 848 (9th Cir. 2003) (relying on *Delgado v. Lewis*, 223 F.3d 976 (9th Cir. 2000)).

Based upon the findings of fact by the state trial court, the Court concludes that the state court decision is not objectively unreasonable as to its implicit rejection of Petitioner's *Trombetta* and *Youngblood* claim.  Under the factual circumstances set forth in the record, the Court concludes that the guns were not exculpatory.  Petitioner has no evidence showing how the black nine millimeter gun was placed back in its holster in a tool chest 28 feet away from Luella Bingham's final resting place after she allegedly had it in her hand and was immediately shot to death by Petitioner.  Petitioner has no facts supportive of his theory that either Bingham had a gun at the time they were shot that would rebut the presumption of correctness of the state court's factual findings regarding

**MEMORANDUM ORDER - 21**

credibility of the officers, the lack of any bad faith, and the circumstances surrounding the undisclosed guns.  Because the guns were not exculpatory and there was no bad faith involved, Claim I(c) fails.

**D.      Discussion of Claim II and its Subparts (Cross-Examination)**

The Court previously determined that Claim II(a) was procedurally defaulted, which was a claim that the trial court should not have prevented Petitioner from introducing evidence of  Ron Bingham's prior conviction for rape, a letter from Loa Smith detailing sexual improprieties the Binghams engaged in with her in 1991-92, and evidence of the Binghams' drug dealing and use of controlled substances.  The Court also previously determined that Claim III, that the state trial court refused to instruct the jury on defense of others under I.C. § 19-202A, was procedurally defaulted.  Petitioner's Claim II(e) is a repetition of Claim III, and therefore the Court will not separately address it but will consider it procedurally defaulted.

The remaining claims are as follows:

Claim II      The State denied Petitioner his Sixth Amendment right to effectively cross-examine witnesses and unconstitutionally restricted his right to present certain evidence.

II(b)      The trial court erred when it limited the defense's cross-examination of the police officers on the following topics: (1) knowledge of the Binghams' prior criminal record which included Ron's prior rape conviction; and (2) discovery of a suitcase during the search of the Bingham residence that contained evidence supporting the rape allegations and corroborating the victims' claims that sexual instruments were used on them during the course of rape by the Binghams.

**MEMORANDUM ORDER - 22**

II(d)        The trial court erred in limiting cross-examination on subjects brought out on direct examination by the State.

The Idaho Court of Appeals addressed the cross-examination issue on direct appeal.  *See State's Exhibit B-4*, at pp. 42-43.  That court concluded that the trial court had not violated Petitioner's constitutional right to confront witnesses by limiting counsel's cross-examination of the police officers regarding the officers' earlier concerns for Petitioner's daughters and what officers knew of Ronald Bingham and his prior conviction for rape and other reported rapes of young girls.  The Idaho Court of Appeals explained:

> The right of cross-examination is included in the right of confrontation as guaranteed by the Sixth Amendment. *Pointer v. Texas*, 380 U.S. 400, 85 S.Ct. 1065, 13 L.Ed.2d 923 (1965); *Douglas v. Alabama*, 380 U.S. 415, 85 S.Ct. 1074, 13 L.Ed.2d 934 (1965). A defendant's right to confront and cross-examine witnesses, however, is not absolute. *State v. Araiza*, 124 Idaho 82, 91, 856 P.2d 872, 881 (1993). The trial court may reasonably limit cross-examination that is harassing, confusing, repetitive or only marginally relevant. *Id.*, citing *Delaware v. Van Arsdall*, 475 U.S. 673, 106 S.Ct. 1431, 89 L.Ed.2d 674 (1986); *State v. Downing*, 128 Idaho 149, 153, 911 P.2d 145, 149 (Ct.App.1996).

> "Relevant evidence" means evidence having a tendency to make the existence of any fact that is of consequence to the determination of the action more probable or less probable than it would be without the evidence. I.R.E. 401. Relying on the offer of proof, the district court below determined that counsel had failed to show a connection between the officers' knowledge and Arrasmith's defense to the murder charges, and determined that the cross-examination was not relevant. Further, when, as in this case, the attempted cross-examination contravened the district court's pretrial order excluding evidence of the prior conviction and other character evidence, the district court correctly exercised its discretion in barring questions on cross-examination that sought to introduce inadmissible evidence to the jury notwithstanding the pretrial order. We conclude that the

**MEMORANDUM ORDER - 23**

district court did not violate Arrasmith's constitutional right to confront witnesses by limiting counsel's cross-examination of the police officers.

*Id.*, 966 P.2d at 43.

The Idaho Court of Appeals appropriately applied United States Supreme Court precedent governing Sixth Amendment cross-examination claims.   The Idaho Court of Appeals' reasoning is in line with that precedent.   In *Delaware v. Van Arsdall*, 475 U.S. 673 (1986), the Supreme Court more fully explained:

> [T]rial judges retain wide latitude insofar as the Confrontation Clause is concerned to impose reasonable limits on such cross-examination based on concerns about, among other things, harassment, prejudice, confusion of the issues, the witness' safety, or interrogation that is repetitive or only marginally relevant. And as we observed earlier this Term, "the Confrontation Clause guarantees an opportunity for effective cross-examination, not cross-examination that is effective in whatever way, and to whatever extent, the defense might wish."

475 U.S. at 678 (internal citation omitted).

Based on its review of the record, the Court concludes that the Idaho Court of Appeals' decision is not an unreasonable application of the limiting principles set forth in *Van Arsdall*.  While Petitioner was not permitted to introduce the bad character evidence of the Binghams mentioned above, he *was* permitted to have his daughter testify at length about how the Binghams forced her to use drugs, sexually abused her, raped her, and threatened her.  Another woman in her mid-twenties also testified that the Binghams raped, drugged, and sexually abused her and Petitioner's daughter; this woman also testified about Ron Bingham's suitcase full of sex devices.  Petitioner testified about the

**MEMORANDUM ORDER - 24**

threats Ron Bingham had made against him, including rumors that Bingham wanted to or had hired someone to kill Petitioner, and Petitioner testified about his fears for the safety of the teenaged girl that was currently living with the Binghams.

The trial court properly drew the line where it did regarding other bad character evidence.  Under *Van Arsdall*, Petitioner's Sixth Amendment right to cross-examination does not entitle him to present evidence that is not relevant to the charges or the defense. Petitioner has failed to show a relevant connection between allowing the officers to be cross-examined on whether they believed there had been adequate evidence to remove Petitioner's daughter from the Bingham's home and whether Petitioner acted in self-defense or the defense of others.  The record is clear that at the time Petitioner shot the Binghams, there was no immediate threat to Petitioner's daughter or the other teenaged girl who was of concern to Petitioner.  The other bad character evidence Petitioner wished to present likewise had no relevant connection to his defense.[2]

---

[2]    Petitioner argued in the state court that Idaho Code § 19-202A provided him with a complete defense.  He reasoned that, in killing the Binghams, he was merely coming to the defense of his daughter and another potential minor child victim of the Binghams.
 I.C. § 19-202A  provides:
>  No person in this state shall be placed in legal jeopardy of any kind whatsoever for protecting himself or his family by reasonable means necessary, or when coming to the aid of another whom he reasonably believes to be in imminent danger or the victim of aggravated assault, robbery, rape, murder or other heinous crime.
Based on common rules of statutory construction, the Idaho Court of Appeals determined that the statute did not apply to the circumstances of Petitioner's case:
>  The district court correctly held that the words "the victim" do not mean victims against whom a crime has already been completed, but those who are presently being victimized when the accused steps forward to protect them.  The district court did not err when it concluded that the statute only provides a defense

Based on the foregoing, the Court concludes that the Idaho Court of Appeals' decision affirming the trial court's evidentiary rulings and limitations on cross-examination was not contrary to, or an unreasonable application of, the Sixth Amendment's Confrontation Clause and United States Supreme Court precedent governing that issue.  For these reasons, the Court concludes that federal habeas corpus relief is not warranted.  Petitioner's Petition for Writ of Habeas Corpus shall be dismissed with prejudice.

## E.    Instructions for Appeal

Before a petitioner may appeal from the dismissal of a 28 U.S.C. § 2254 petition, he must first obtain a certificate of appealability by filing a request for a certificate of appealability with the federal district court.  28 U.S.C. § 2253(c).  Until a certificate of appealability has been issued, an appellate court lacks jurisdiction to rule on the merits of an appeal.  *Miller-El v. Cockrell*, 537 U.S. 322, 336 (2003).  A federal district court will

---

to persons who come to the aid of someone in imminent danger or a victim of a crime in progress.

*Id.*, 966 P.2d at 40.

Petitioner cannot renew his I.C. § 19-202A argument here.  A federal habeas court is "bound by a state's interpretation of its own laws."  *Himes v. Thompson*, 336 F.3d 848, 852 (9th Cir. 2003).  The United States Supreme Court has emphasized:

[I]t is not the province of a federal habeas court to reexamine state-court determinations on state-law questions. In conducting habeas review, a federal court is limited to deciding whether a conviction violated the Constitution, laws, or treaties of the United States."

*Estelle v. McGuire*, 502 U.S. 62, 67-68 (1991).  Accordingly, Petitioner has no federal claim that the state court's interpretation is erroneous.

**MEMORANDUM ORDER - 26**

not issue a certificate of appealability absent "a substantial showing of the denial of a constitutional right."  28 U.S.C. § 2253(c)(2).  A petitioner satisfies this standard by demonstrating that reasonable jurists would find debatable both the merits of the constitutional claims and any dispositive procedural rulings by the district court.  *Miller-El v. Cockrell*, 537 at 336 (2003).

# IV.

## ORDER

NOW THEREFORE IT IS HEREBY ORDERED that Respondent's Motion for Summary Judgment (Docket No. 28) is GRANTED.  Petitioner's Petition for Writ of Habeas Corpus is DISMISSED with prejudice.

IT IS FURTHER HEREBY ORDERED that Respondent's Motion to Strike (Docket No. 38) is GRANTED.

IT IS FURTHER HEREBY ORDERED that Petitioner's Motion for Extension of Time to File Reply as to Respondent's Motion to Strike (Docket No. 39) is MOOT.

**MEMORANDUM ORDER - 27**

IT IS FURTHER HEREBY ORDERED that Petitioner's Motion for a More Definite Statement (Docket No. 42) is DENIED.

DATED:  **September 1, 2006**

Honorable Edward J. Lodge
U. S. District Judge

**MEMORANDUM ORDER - 28**